**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD SMITH, | ) | CASE NO. 3:13-CV-00776 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Richard Smith ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On June 29, 2010, Plaintiff filed applications for DIB, POD, and SSI and alleged

a disability onset date of March 15, 2002.  (Transcript ("Tr.") 9.)  The application was

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On February 8, 2012, an ALJ held Plaintiff's

hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and

testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On March 30, 2012, the ALJ found Plaintiff not disabled.  (Tr. 6.)  On February 21, 2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On April 9, 2013, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16, 19.)

Plaintiff asserts the following assignment of error: The ALJ's assessment of Plaintiff's mental and physical residual functional capacity is not supported by substantial evidence.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in July 1964 and was 37-years-old on the alleged disability onset date.  (Tr. 19.)  He had at least a high school education and was able to communicate in English.  (*Id.*)  He had past relevant work as an automobile mechanic, roofing laborer, and grounds worker.  (Tr. 18.)

### B.    Medical Evidence[1]

### 1.    Physical Impairments

---

[1]    On October 28, 2008, a prior ALJ held that Plaintiff was not disabled, finding that he could perform light work that was simple and repetitive and required only limited contact with others.  (Tr. 66.)  Plaintiff noted in his Brief on the Merits that he "recognizes the res judicata effect of the prior hearing decision in regard to the issue of disability up through October 28, 2008."  (Plaintiff's Brief ("Pl.'s Br.") at 4.)  Plaintiff therefore related only those facts from Plaintiff's records subsequent to October 28, 2008.  (*Id.*)  The following discussion of the medical evidence is likewise limited to records subsequent to that date.

2

On January 12, 2011, Plaintiff underwent a physical consultative examination by Marsha Cooper, M.D.  (Tr. 492.)  Plaintiff appeared underweight and somewhat inappropriate in his manner and behavior.  (Tr. 493.)  Diagnostic testing revealed mild degenerative changes in Plaintiff's neck; no significant degeneration or abnormality in his hip; and no abnormal bony findings, knee effusion, or soft tissue swelling despite broken hardware in his knee.  (Tr. 485-486.)  An x-ray revealed that the patella had fractured hardware with respect to a pin and cerclage wire and explained Plaintiff's complaint of issues with his knee.  (Tr. 494.)   Plaintiff had normal muscle strength and range of motion throughout his body, with no evidence of muscle spasm or atrophy present.  (Tr. 488-491.)  Other than appearing underweight, Plaintiff's physical examination was normal.  (Tr. 493.)  Dr. Cooper opined that Plaintiff was unlimited in his ability to sit but should avoid work that involves going up and down stairs, bending, squatting, or prolonged standing.  (Tr. 494.)

### 2.   Mental Impairments

#### a.   Medical Reports

On April 13, 2009, Plaintiff began mental health treatment at Firelands Counseling and Recovery Services.  (Tr. 338.)  He was self-referred as well as referred by his family, significant other, friend, and his neighbor for individual counseling.  (*Id.*)  The diagnostic impression included Bipolar I Disorder, most recent episode depressed, chronic with rapid cycling; Anxiety Disorder; and Nicotine Dependance.  (Tr. 340.)  Plaintiff had a Global Assessment of Functioning ("GAF") score of 45.[2]  (Tr. 341.)

---

[2]   The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health

On May 1, 2009, Plaintiff saw Arthur O'Leary, M.D., for a mental status examination  (Tr. 394.)  Dr. O'Leary noted that Plaintiff "both laughed and was tearful during the course of the interview."  (Tr. 394.)  Plaintiff's mood was depressed.  (*Id.*)  Dr. O'Leary found no evidence of hallucinations, and Plaintiff did not express fearfulness and denied suicidal or homicidal ideation.  (*Id.*)  Plaintiff's memory and concentration were grossly intact though not formally evaluated, his IQ was estimated to be within the normal range, and his insight and judgment was considered impaired.  (*Id.*)  Dr. O'Leary diagnosed Bipolar Disorder, not otherwise specified ("NOS").  (*Id.*)  Plaintiff was prescribed medication and encouraged to follow through with counseling as scheduled.  (*Id.*)

Plaintiff continued counseling twice per month.  On April 9, 2010, his primary diagnosis remained Bipolar I Disorder, most recent episode depressed.  (Tr. 342-343.)  On October 28, 2011, Dr. O'Leary completed a medical source statement regarding Plaintiff's mental capacity.  (Tr. 512-513.)  Dr. O'Leary indicated that Plaintiff had poor abilities in the following areas: following work rules; using judgment; maintaining attention and concentration for extended periods of two-hour segments; responding appropriately to changes in routine settings; maintaining regular attendance and being punctual within customary tolerance; dealing with the public; relating to co-workers; interacting with supervisors; functioning independently with or in proximity to others without being unduly distracted or distracting; dealing with work stresses;

---

illness devised by the American Psychiatric Association.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupation, or school functioning.

4

understanding, remembering, and carrying out detailed, but not complex, job

instructions; and understanding, remembering, and carrying out simple job instructions.

(Tr. 512-513.)

### b.    Agency Reports

Wayne Morse, Ph.D., evaluated Plaintiff on October 4, 2010, at the request of

the Social Security Administration. (Tr. 397-404.)  The evaluation consisted of a clinical

interview and a mental status examination.  (Tr. 397.)  Dr. Morse estimated Plaintiff's

cognitive functioning to be in the Low Average Range, although no formal intellectual

assessment was conducted. (Tr. 401.)  Plaintiff's insight and judgment appeared to be

"fairly good," with the exception of his marijuana consumption.  (*Id.*)  He stated that on a

typical day, he does basic chores around the house, but he cannot be on his feet for

too long.  (Tr. 402.)  He reported that he cannot read or write very well, has difficulty

following directions, needs help changing clothes, and is very fearful around large

groups of people.  (*Id.*)  Dr. Morse's impression included Cannabis Dependence;

Bipolar I Disorder, most recent episode manic, severe without psychotic features, rapid

cycling; Panic Disorder Without Agoraphobia; and Posttraumatic Stress Disorder.  (Tr.

403.)  Dr. Morse assigned a GAF score of 58[3] and concluded that Plaintiff's ability to

relate to others was markedly impaired; his ability to understand, remember, and follow

instructions was moderately impaired; his ability to maintain attention to perform simple,

---

[3]    A GAF score between 51 and 60 indicates moderate symptoms or
moderate difficulty in social, occupational, or school functioning.  Dr.
Morse noted that "[b]ecause Plaintiff functions in the upper region of the
moderate impairment range for both symptom severity and mental health
functioning, a final GAF score of 58 has been assigned."  (Tr. 403.)

repetitive tasks was moderately impaired; and his ability to withstand the stress and pressures associated with day-to-day work activities was moderately impaired.  (*Id.*)  Dr. Morse opined that Plaintiff's chronic marijuana use exacerbated his mental health symptoms.  (Tr. 403.)

On October 12, 2010, state reviewing psychologist Paul Tangeman, Ph.D., considered Plaintiff's medical records and reported that Plaintiff could perform simple tasks with limited production standards, basic work activities with few interpersonal demands and minimal to no contact with the public, and routine tasks in a static work setting.  (Tr. 73-74.)

**C.  Hearing Testimony**

**1.  Plaintiff's Hearing Testimony**

Plaintiff was 5'9" and weighed 146 pounds.  (Tr. 36.)  He attributed his weight loss to nausea and constipation.  (*Id.*)  He testified that he eats one meal per day.  (Tr. 38.)

Plaintiff had pain with his left knee and right hip.  (Tr. 39.)  "It's an agony pain to where every time I get up and down it cracks."  (Tr. 43.)  When he was 18-years-old, he had surgery on his patella on his left knee cap.  (Tr. 40.)  The hardware in Plaintiff's knee had since broken but he did not have the funds to remove the hardware.  (*Id.*)  He testified that he would have a knee replacement if he was able to afford it.  (*Id.*)  He took pain pills like Ibuprofen only when he really needed them.  (Tr. 45.)  Plaintiff testified that he can sit for about 15-30 minutes but is not always comfortable and is always adjusting.  (*Id.*)  He could stand for about 15 minutes but could walk for less

6

than that due to breathing trouble.  (Tr. 46.)  He could lift a gallon of milk.  (*Id.*)  He had

difficulty opening things because his hands would dry out and crack open and bleed

often.  (Tr. 47.)

Plaintiff sometimes experienced panic attacks when he was around a lot of

people.  (Tr. 52.)  He has had suicidal thoughts.  (Tr. 52-53.)  He sometimes became

mad and revengeful and "boil[s] up and go[es] off the handle at the littlest thing

sometimes."  (Tr. 53.)  He testified that this happened even when he was taking his

medication.  (*Id.*)

Plaintiff had a driver's license and occasionally drove to the grocery store.  (Tr.

40.)  He graduated from high school and completed vocational school training for

agricultural mechanics.  (Tr. 41.)  He had past work as an auto mechanic, roofing

laborer, and grounds worker/tree cutter.  (Tr. 42.)  Plaintiff was able to go grocery

shopping and take out the garbage.  (Tr. 48.)  He did not help with housework and

sometimes needed help putting on his socks and buttoning things because of his

hands.  (Tr. 48-49.)  He could use the telephone and watch TV but did not use a

computer.  (Tr. 49.)  He did not attend church or club meetings, visit with friends or

relatives, or participate in any sports.  (Tr. 50.)  He smoked about a pack of cigarettes

every two days.  (Tr. 51.)  He did not drink alcohol.  (*Id.*)

### 2.    Vocational Expert's Hearing Testimony

Earl Thompson, a vocational expert, testified at Plaintiff's hearing.  (Tr. 57.)  The

ALJ first asked the VE to consider the residual functional capacity ("RFC") assessed by

the first ALJ from Plaintiff's prior case.  (Tr. 58.)  The ALJ asked the VE to assume an

individual of Plaintiff's age, education, and work experience who is able to perform light work except that he can understand and follow only simple instructions, and he must have only limited contact with others in the workplace.  (*Id.*)  The VE testified that Plaintiff's past work would be eliminated due to the exertional criteria alone.  (Tr. 59.)  The individual would be able to perform work at the light, unskilled level, including work as a janitor (6,000 jobs in Ohio and 180,000 nationally), a machine tender (3,000 jobs in Ohio and 90,000 nationally), and an assembler (40,000 jobs in Ohio and 1.2 million nationally).  (Tr. 59.)

The ALJ then asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience who is able to perform light work but cannot go up or down stairs, bend, squat, or do prolonged standing.  (*Id.*)  The individual would be able to sit unencumbered and would have no limitations related to sitting.  (*Id.*)  The VE testified that Plaintiff's past work would be eliminated, and "[a]t best, we'd be dealing with a sedentary occupational base."  (Tr. 60.)  At the sedentary, unskilled level, the hypothetical individual could perform the following jobs: bench worker (1,000 jobs in Ohio and 30,000 nationally), assembler (1,000 jobs in Ohio and 24,000 nationally), and hand mounter (1,000 jobs in Ohio and 30,000 nationally).  (*Id.*)

Plaintiff's counsel asked the VE to assume the same individual from the ALJ's second hypothetical, but added that the individual should have no contact with the general public and only brief and superficial contact with supervisors and co-workers. (Tr. 60-61.)  Plaintiff's counsel added that the individual would be unable to complete a normal workday or workweek without interruptions from psychologically-based symptoms such that it would affect his performance and pace and ability to stay

8

consistent with work, meaning he would be off task approximately 25 percent of an average workday.  (Tr. 61.)  The VE testified that being off task for 25 percent of the day would eliminate competitive employment.  (*Id.*)  When Plaintiff's counsel asked the VE if an employer would tolerate verbal outbursts from an employee, the VE testified that it would depend on the extent and frequency of the outbursts.  (*Id.*)  A threat of bodily harm to a co-worker or supervisor may lead to immediate dismissal.  (Tr. 62.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905

F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   Plaintiff meets the insured status requirements of the Act through June 30, 2010.

2.   Plaintiff has not engaged in substantial gainful activity since March 15, 2002, the alleged onset date.

3.   Plaintiff has the following severe impairments: degenerative disc disease of the cervical spine; Schmorl's node herniation of the thoracic spine; status-post fracture of left knee with traumatic arthritis; status post surgery to repair bilateral inguinal hernias; depressive disorder; bipolar disorder; anxiety disorder; panic disorder; posttraumatic stress disorder; alcohol abuse in remission; and cannabis abuse.

4.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined

in 20 CFR 404.1567(b) and 416.967(b) except he can understand and follow only simple instructions and must have only limited contact with others in the workplace.

6.      Plaintiff is unable to perform any past relevant work.

7.      Plaintiff was born in July 1964 and was 37-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Plaintiff subsequently changed age category to closely approaching advanced age.

8.      Plaintiff has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills.

10.     Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Act, from March 15, 2002, through the date of this decision.

(Tr. 11-20.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence,

regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.   Plaintiff's Assignment of Error**

      **1.   The ALJ's Assessment of Plaintiff's Mental and Physical Residual Functional Capacity is Not Supported by Substantial Evidence.**

            **a.   The ALJ Did Not Properly Evaluate the Opinion of State Consultative Examiner Dr. Cooper.**

Plaintiff takes issue with the ALJ's evaluation of the opinion of state consultative examiner Marsha Cooper, M.D.  According to Plaintiff, the ALJ erred by giving great weight to the RFC determination of the first ALJ who heard Plaintiff's claim for benefits, because Dr. Cooper's opinion provided objective new evidence of a deterioration in Plaintiff's condition since the time of Plaintiff's first hearing.  Furthermore, Plaintiff contends that the ALJ erred in finding that Dr. Cooper had not provided any objective

12

evidence to support additional limitations beyond those included in the ALJ's RFC determination.

Absent substantial evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ.  *See Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842-43 (6th Cir. 1997).  Adjudicators must adopt the RFC finding of a prior ALJ unless there is new and material evidence relating to the finding or there has been a change in the law.  AR 98-4(6).  Plaintiff contends that the ALJ erred in giving great weight to the first ALJ's RFC determination, because subsequent findings from Dr. Cooper show that Plaintiff's condition significantly deteriorated since the first ALJ's decision.  Plaintiff's argument that Dr. Cooper's January 2011 medical source statement includes new evidence establishing that Plaintiff is significantly underweight and has fractured hardware in his left patella is not well taken, as the information in Dr. Cooper's report does constitute new or material evidence supporting a deterioration in Plaintiff's condition.  While Dr. Cooper reported that Plaintiff was "significantly underweight," at 153 pounds, Plaintiff has failed to show what impact, if any, his low weight has on his ability to work.  (Tr. 493, 494.)  Dr. Cooper noted that "[t]he Physical Exam is impressive with respect to [Plaintiff's] underweight issue."  (Tr. 494.)  She did not expand upon this finding, however, or explain how Plaintiff would be limited in his abilities based on his low weight.  Moreover, as the Commissioner notes, Plaintiff actually weighed seven pounds more at the time of Dr. Cooper's examination than he did when he filed his application for benefits.  (Tr. 242, 494.)  As a result, Plaintiff's low body weight at the time of Dr. Cooper's examination does not establish a deterioration in his condition.

With regard to the fractured hardware in Plaintiff's knee, Dr. Cooper noted the following in her medical source statement:

> The x-ray done on [Plaintiff], as read by Dr. Karen Sheehan, reveals that the patella has fractured hardware with respect to a pin and cerclage wire and would explain his complaint of issues with the knee.  Based on that finding and his complaint, he would be advised to do no work that involves going up and down stairs, bending, squatting, or prolonged standing.

(Tr. 494.)  Plaintiff argues that this evidence of fractured hardware in Plaintiff's knee is "new," and that it supports a conclusion that Plaintiff's condition has deteriorated since the first ALJ's decision.  On the other hand, the Commissioner asserts that the ALJ explained that Plaintiff's prior claim included the same x-ray evidence of fractured hardware that Dr. Cooper reviewed.  Indeed, the transcript from Plaintiff's hearing indicates that Plaintiff's prior claim included evidence of fractured hardware in the knee.  The ALJ stated:  "The other thing is the fracture[d] hardware actually goes back to the x-ray from the prior folder showed the fractured hardware at the last.  That's not a change."  (Tr. 34.)  While the ALJ did not expand upon this notion, Plaintiff had the opportunity to file a reply brief and cite to evidence contradicting the ALJ's statement and challenging the Commissioner's argument.  Plaintiff did not do so.  Even if the first ALJ had not considered evidence of fractured hardware, Plaintiff has not adequately supported his argument that fractured hardware in his knee has caused his condition to deteriorate.  As explained in more detail below, the objective evidence of record fails to support Dr. Cooper's conclusion that Plaintiff cannot perform work involving going up and down stairs, bending, squatting, or prolonged standing due to his knee issues.  As a result, Plaintiff has not met his burden of proving that new or material evidence exists

14

showing a deterioration in Plaintiff's condition since the first ALJ's decision. Accordingly, Plaintiff's argument that the ALJ erred by giving great weight to the first ALJ's decision is without merit.

The ALJ did not err in finding that objective evidence failed to support additional limitations beyond those included in his RFC determination.  It is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec., 203 F.3d 388, 391 (6th Cir. 1999)* ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], when the claimant is proving the extent of his impairments.")  Here, Plaintiff presented the opinion of Dr. Cooper, who concluded that, based on x-ray evidence of fractured hardware in the left patella, Plaintiff should be limited to work that does not involve going up and down stairs, bending, squatting, or prolonged standing.  (Tr. 494.) With the exception of this opinion, however, Plaintiff offers no other medical opinion finding that his knee problems limit his ability to work, nor does he cite to objective evidence in the record supporting Dr. Cooper's finding.  Furthermore, as the Commissioner asserts in her Brief on the Merits, substantial evidence supports the ALJ's RFC determination, which does not include Dr. Cooper's limitations. (Defendant's Brief ("Def.'s Br.") 7-8.)  For example:

- Plaintiff did not pursue any treatment for his back, hip, and knee pain during the relevant period.

- Diagnostic testing showed only mild degenerative changes in Plaintiff's neck; no significant degeneration or abnormality in his hip; and no

abnormal bony findings, knee effusion, or soft tissue swelling despite broken hardware in his knee.  (Tr. 485-486.)

• Plaintiff had normal muscle strength and range of motion throughout his body, and there was no evidence of muscle spasm or atrophy.  (Tr. 488-491.)

• Plaintiff engaged in significant activities despite his knee problems.  He performed roofing work, cared for his five dogs, remodeled a room in his home, worked on cars, went fishing, spent time on his computer, built items, and completed gardening and yard work and other projects around his home.  (Tr. 349, 353, 355, 412, 495, 506, 514, 527.)

• Although Plaintiff testified that he had insufficient funds to pursue treatment for his physical impairments (Tr. 37), he had sufficient funds to smoke one pack of cigarettes per day and to regularly smoke marijuana (Tr. 15, 315, 340).

• The record reflects that Plaintiff performed work activities during the relevant period.[4]  Progress notes reflect that he had customers and reported earning money.  (Tr. 349, 352, 360.)  He also admitted in 2010 and 2011 that he "pick[ed] up some more side work to bring in some income."  (Tr. 347, 495.)  The record is devoid of any symptom exacerbation as a result of this activity.

The aforementioned evidence supports the ALJ's conclusion that Dr. Cooper's opinion was not supported by the objective evidence.  Thus, Plaintiff failed to sustain his burden of proving that, because of the fractured hardware in his knee, additional limitations should have been included in his RFC.[5]  Accordingly, Plaintiff's arguments as

---

[4]     Social Security regulations indicate that even if below the substantial gainful activity level, "the work . . . that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level." 20 C.F.R. § 404.1571.

[5]     Because this Court concludes that substantial evidence supports the ALJ's omission of limitations on climbing, bending, squatting, or prolonged standing from Plaintiff's RFC, it is not necessary to address the Commissioner's alternative argument that, even if these limitations should be included in the RFC, the ALJ identified jobs that do not require Plaintiff to climb steps, bend, squat, or stand for a prolonged period.  The ALJ,

16

to the ALJ's assessment of Dr. Cooper's opinion do not present a basis for remand.

> **b.**     **The ALJ Did Not Properly Evaluate the Opinion of Plaintiff's Treating Psychiatrist, Dr. O'Leary.**

Plaintiff argues that the ALJ erred by giving less than controlling weight to the opinion of Plaintiff's treating psychiatrist, Dr. O'Leary.  The Commissioner responds that the ALJ reasonably afforded less weight to Dr. O'Leary's opinion, because it was both internally inconsistent and inconsistent with the record as a whole.  For the following reasons, Plaintiff's argument lacks merit.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of*

---

however, identified these positions without regard to whether they included these limitations.  "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citation omitted)).  Accordingly, this Court cannot accept the Commissioner's *post hoc* rationalizations for agency action.  *Id.*

*Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

Here, the ALJ gave good reasons for declining to assign controlling weight to Dr. O'Leary's opinion, and substantial evidence supports that conclusion.  The ALJ gave "some weight" to the opinion Dr. O'Leary rendered in a medical source statement from October 2011.  (Tr. 17.)  Dr. O'Leary assessed Plaintiff's mental limitations by rating his abilities in certain areas from "unlimited or very good" to "poor."  (Tr. 512-513.)  The ALJ noted that while Dr. O'Leary identified the areas in which Plaintiff has limitations, "the limitations opined by Dr. O'Leary are internally inconsistent and inconsistent with the medical record as a whole.  For example, he opined that the claimant was poor at understanding, remembering, and carrying out simple tasks, but then opined that the claimant was fair at understanding, remembering, and carrying out complex tasks." (*Id.*)  The ALJ concluded that the inconsistencies involving Dr. O'Leary's opinion reduced the persuasiveness of his opinion.  (*Id.*)

The ALJ reasonably afforded less than controlling weight to Dr. O'Leary's medical source statement, because – as the ALJ noted – the opinions included in the medical source statement were internally inconsistent.  While Dr. O'Leary opined that Plaintiff's ability to use judgment and function independently without special supervision was poor, he also noted that Plaintiff's ability to manage his own funds and schedules was good, his ability to maintain his appearance was good, and his ability to leave

18

home on his own was fair.  (Tr. 512-513.)  While Dr. O'Leary reported that Plaintiff's ability to deal with the public, relate to co-workers, and interact with supervisors was poor, he also noted that Plaintiff's ability to socialize was good, his ability to relate predictably in social situations was fair, and his ability to behave in an emotionally stable manner was good.  (*Id.*)  Furthermore, the ALJ specifically noted that on the medical source statement form, Dr. O'Leary opined that Plaintiff had a fair ability to understand, remember, and carry out *complex* work instructions, but a poor ability to understand, remember, and carry out *simple* job instructions.  (Tr. 513.)  Thus, a review of Dr. O'Leary's medical source statement indicates that the ALJ was justified in finding Dr. O'Leary's opinions to be inconsistent.  While the medical source statement provided a space for Dr. O'Leary to note the medical or clinical findings supporting his assessment, Dr. O'Leary chose not to do so.  (Tr. 513.)  Thus, the ALJ was left only with a checklist form that included contradictory opinions.  As a result, the ALJ did not err in finding that the inconsistencies on the face of Dr. O'Leary's medical source statement reduced its persuasiveness.

Furthermore, the ALJ was justified in giving less than controlling weight to Dr. O'Leary's opinion, because it was inconsistent with Plaintiff's medical record as a whole.  As an example, while Dr. O'Leary opined that Plaintiff's' ability to deal with the public, relate to co-workers, and interact with supervisors was poor, the ALJ discussed progress notes from Firelands that consistently reflected that Plaintiff was cooperative and interacted appropriately.  (Tr. 17, 347, 411-413, 496, 507, 509, 511, 515, 528, 530.)  The ALJ also noted that, according to treatment notes, Plaintiff's medications have been fairly successful in reducing his mental health symptoms.  (Tr. 17.)  "In fact,

19

on May 9, 2011, the claimant stated that the medicine was helping him; on October 18, 2011, he added that he feels less irritable, less moody, and less depressed; and on November 15, 2011[,] the claimant stated that others have noticed his positive behavior." (*Id.*)  Evidence of an improvement in Plaintiff's condition as a result of medication further supports the ALJ's conclusion that Dr. O'Leary's findings of poor abilities in several areas is inconsistent with the medical record as a whole. Accordingly, the ALJ provided "good reasons" for assigning less than controlling weight to Dr. O'Leary's opinion, and Plaintiff's argument under the treating physician rule does not present a basis for remand.

> **c.  The ALJ Did Not Properly Evaluate the Opinion of Social Security Consultant Dr. Morse.**

Plaintiff argues that the ALJ did not properly evaluate the opinion of Social Security consultant Dr. Morse, who concluded that Plaintiff was markedly impaired in his ability to relate to others.  The Commissioner responds that the ALJ provided a sufficient explanation for failing to adopt Dr. Morse's finding of marked limitations in social functioning.  For the following reasons, Plaintiff's argument is not well taken.

In assigning "some" weight to Dr. Morse's opinion and concluding that Plaintiff's ability to relate to others was not markedly impaired as Dr. Morse suggested, the ALJ noted that a finding of a marked limitation in mental functioning is inconsistent with Dr. Morse's assessment of a GAF score of 58.  (Tr. 18, 403.)  A GAF score between 51 and 60 indicates moderate symptoms, or moderate difficulty in social, occupational, or school functioning.  In deciding not to adopt Dr. Morse's opinion that Plaintiff was markedly impaired in his ability to relate to others, the ALJ noted: "[A] GAF score of 58

seems inconsistent with a finding that the claimant has a marked mental limitation.  As such, I afford more weight to the GAF score of 58, which indicates moderate limitations, than the unsupported opinion that the claimant has a marked limitation in his ability to relate to others (Ex. B4F)."  (Tr. 18.)

As a preliminary matter, Dr. Morse examined Plaintiff on only one occasion, and, thus, his opinion is entitled to no special deference.  *See Atterberry v. Sec'y of Health & Human Servs., 871 F.2d 567, 571 (6th Cir. 1989).*  Moreover, Dr. Morse expressly stated that his assessment of a marked limitation in social functioning was based on Plaintiff's reports of a long history of difficulty controlling his anger.  (Tr. 403.)  In fact, Dr. Morse reported that based on his medical observation of Plaintiff during the evaluation, Plaintiff "related adequately," was cooperative, and responded appropriately.  (Tr. 399, 403.)

Furthermore, substantial evidence in the record supports the ALJ's explanation for rejecting Dr. Morse's conclusion that Plaintiff was markedly limited in his ability to relate to others.  As addressed previously, the ALJ discussed progress notes from Firelands that consistently reflected that Plaintiff was cooperative and interacted appropriately.  (Tr. 17, 347, 411-413, 496, 507, 509, 511, 515, 528, 530.)  These treatment notes coupled with Dr. Morse's assessment of a GAF score of 58, indicating moderate symptoms, provide sufficient support for the ALJ's decision to reject Dr. Morse's conclusion that Plaintiff was markedly impaired regarding social functioning.  The ALJ did not reject Dr. Morse's opinion altogether; rather, he specifically noted that "the evidence clearly indicates that the claimant has some moderate limitations" and adequately accounted for Plaintiff's impairments in social functioning by limiting him to

21

work that requires only limited contact with others in the workplace.  (Tr. 14.)

Accordingly, Plaintiff's argument as to Dr. Morse is without merit.

> **d.** **The ALJ Erred by Failing to Adopt the Reviewing Psychologists' Opinions as a Whole**.

The ALJ gave "significant weight" to the opinions of the state agency

psychological consultants, noting that the opinions were "fairly consistent with the

medical record as a whole."  (Tr. 18.)  The ALJ did not, however, include all of the

limitations assessed by the state agency psychological consultants in Plaintiff's RFC.

Plaintiff argues that because the ALJ gave significant weight to the opinions of the state

reviewing psychologists, the ALJ erred by failing to adopt those opinions as a whole.

State agency medical and psychological consultants are "highly qualified

physicians, psychologists, and other medical specialists who are also experts in Social

Security disability evaluation."  20 C.F.R. § 404.1527.  Administrative law judges are not

bound by any findings made by State agency medical or psychological consultants.  *Id.*

Furthermore, there is no requirement that an ALJ accept every facet of an opinion to

which he assigns significant or substantial weight.  Rather, the relevant regulations

require only that an ALJ explain the general weight given to the opinions of non-

examining physicians.  *See* 20 C.F.R. § 404.1527(e)(2)(ii) ("Unless a treating source's

opinion is given controlling weight, the administrative law judge must explain in the

decision the weight given to the opinions of a State agency. . . psychological consultant

. . . .")  As the ALJ was not required to include in Plaintiff's RFC all of the limitations

assessed by the reviewing psychologists, Plaintiff has not persuaded this Court that

remand is appropriate on this issue.

22

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge


Date: December 11, 2013